**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (*pro hac vice* forthcoming)
Cadio Zirpoli (*pro hac vice* forthcoming)
Christopher K.L. Young (*pro hac vice* forthcoming)
Kevin E. Rayhill*
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
krayhill@saverilawfirm.com

*Admitted to the U.S. District Court for the
Western District of Wisconsin*

**Gratz & Gratz, P.A.**
Michael Gratz, Jr.
312 North Green Street
Tupelo, MS 38804
Telephone: 662.844.5531
Fax: 662.844.8747
michael@gratzandgratz.com

*Attorneys for Plaintiffs*

**COTCHETT, PITRE & McCARTHY LLP**
Joseph W. Cotchett
Adam J. Zapala
Elizabeth T. Castillo
Christian S. Ruano
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cruano@cpmlegal.com

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BOONEVILLE PHARMACY OF MS, INC., BYHALIA DRUG COMPANY, LLC AND OKOLONA PHARMACY, LLC, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>GOODRX, INC., GOODRX HOLDINGS, INC., CAREMARK, L.L.C., EXPRESS SCRIPTS, INC., MEDIMPACT HEALTHCARE, SYSTEMS, INC., and NAVITUS HEALTH SOLUTIONS, LLC,<br><br>        Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Booneville Pharmacy of MS, Inc., Byhalia Drug Company, LLC and Okolona Pharmacy, LLC ("Plaintiffs"), individually and on behalf of all similarly situated independent pharmacies (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint against Defendants GoodRx, Inc. and GoodRx Holdings, Inc. (collectively, "GoodRx"), Caremark, L.L.C. ("Caremark"), Express Scripts, Inc. ("Express Scripts"), MedImpact Healthcare Systems, Inc. ("MedImpact"), and Navitus Health Solutions, LLC ("Navitus") (collectively with GoodRx, "Defendants") for violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. Plaintiffs seek monetary damages, injunctive relief, and other relief as appropriate.

## I.    INTRODUCTION

1.      Pharmacy benefit managers ("PBMs") are companies that act as intermediaries between pharmacies and insurers and health plans ("Third Party Payers" or "TPPs"). PBMs contract with the TPPs to negotiate discounted prices with pharmacies. The pharmacies gain access to the TPPs' large customer bases in exchange for accepting the discounted prices, an arrangement that only works if the pharmacies can still run a profitable business with the discounted prices. Increasingly, independent pharmacies like the Plaintiffs and the members of the Class cannot. As PBMs take an ever-larger share of America's healthcare dollars, independent pharmacies and the communities they serve suffer:

> Between 2013 and 2022, about ten percent of independent retail pharmacies in rural America closed. Closures of local pharmacies affect not only small business owners and their employees, but also their patients. In some rural and medically underserved areas, local community pharmacies are the main healthcare option for Americans, who depend on them to get a flu shot, an EpiPen, or other lifesaving medicines.[1]

2.      A successful PBM must build a large network of pharmacies in order to attract

---

[1] Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, Interim Staff Report, 1 (July 2024) (internal citations omitted), https://www.ftc.gov/reports/pharmacy-benefit-managers-report ("FTC Report").

TPPs whose customers benefit from access to a wide array of pharmacies. A PBM must also assemble a large network of TPPs on the other side to be able to negotiate lower reimbursements to the pharmacies who benefit from access to a large number of customers.

3.      In a normally functioning competitive market, PBMs would compete against each other to attract pharmacies to their network by offering competitive reimbursements for the medications. The reimbursement rates are confidential, highly sensitive commercial information that would typically be closely guarded trade secrets.

4.      But since at least January 1, 2024, GoodRx and the PBM Defendants have agreed *not* to compete with each other for pharmacies' business, instead sharing their confidential reimbursement information with each other and agreeing to pay pharmacies the lowest reimbursement rate. This has enabled them to suppress payments to independent pharmacies and keep more for themselves. And because the PBM Defendants control nearly two-thirds of the market for prescription transactions, the pharmacies have no choice but to accept their anticompetitive pricing. They have nowhere else to go.

5.      GoodRx facilitates Defendants' unlawful horizontal sharing of confidential, proprietary reimbursement information through a scheme called the "Integrated Savings Program" ("ISP"), in which GoodRx collects confidential reimbursement pricing for generic drugs from each of the PBM Defendants and shares it among them, enabling them to select the lowest reimbursement rate. And because each of the PBM Defendants has access to all of the PBM Defendants' reimbursement information, the cabal can discipline any co-conspirator that tries to gain market share by cheating on the scheme.

6.      By agreeing to share their confidential, commercially sensitive reimbursement information with GoodRx and the other PBM Defendants through GoodRx's ISP, Defendants can and do suppress reimbursements to Plaintiffs and the Class (defined below). This is a horizontal pricing agreement among competitors, a *per se* violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. Plaintiffs and the members of the Class have suffered antitrust injury as a

direct, proximate result of Defendants' unlawful scheme.

7.     The scheme imposes a particularly heavy cost on independent pharmacies like Plaintiffs and the members of the Class. Independent pharmacies are folding at the rate of one a day nationwide. For many underserved communities, independent pharmacies play a crucial role as a health care touchpoint. The loss of these pharmacies can have a devastating effect on the communities they serve, which are often rural and remote and woefully underserved. [2]

## II.    JURISDICTION AND VENUE

8.     Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and Section 1 of the Sherman Act (15 U.S.C. § 1).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

10.     Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22) because Defendants transact business in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the provision of prescription drug dispensing services and the use of GoodRx's discount card programs in this District.

11.     This Court has personal jurisdiction over Defendants because, among other things, they either (1) transacted business throughout the United States, including this District, (2) have substantial contacts within the United States, including in this District, and/or (3) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and doing business in the United States, including in this District.

12.     No other forum would be more convenient for the parties and witnesses to litigate this case.

---

[2] "People say independent pharmacies are a 'critical part' of the healthcare infrastructure. In many parts of rural and urban America, independent pharmacies are the healthcare infrastructure, full stop." *Id.* n.2

### III.    THE PARTIES

13.    Plaintiff Booneville Pharmacy of MS, Inc., located at 206 North Second Street Booneville, Mississippi, is a locally owned independent pharmacy that has sold prescription medications. During the Class Period (defined below) and continuing to this day, Plaintiff received lower prescription claim reimbursements than it would have absent Defendants' conduct alleged herein.

14.    Plaintiff Byhalia Drug Company, LLC is a locally owned independent pharmacy located at 7984 Hwy 178 W, Byhalia, Mississippi 38611. During the Class Period (defined below) and continuing to this day, Plaintiff received lower prescription claim reimbursements than it would have absent Defendants' conduct alleged herein.

15.    Plaintiff Okolona Pharmacy, LLC, is a locally owned independent pharmacy located at 10 W Main St Okolona, Mississippi. During the Class Period (defined below) and continuing to this day, Plaintiff received lower prescription claim reimbursements than it would have absent Defendants' conduct alleged herein.

16.    Defendant GoodRx, Inc. is a Delaware corporation with its principal office or place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. It is a wholly owned subsidiary of GoodRx Intermediate Holdings, LLC, which is a wholly owned subsidiary of GoodRx Holdings, Inc. GoodRx, Inc. transacts business in this District and throughout the United States.

17.    Defendant GoodRx Holdings, Inc. is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. GoodRx Holdings, Inc. transacts business in this District and throughout the United States.

18.    Defendant Caremark, L.L.C. is a California corporation with its headquarters in Woonsocket, Rhode Island. Caremark is a pharmacy benefit manager and a wholly owned subsidiary of CVS Health Corporation ("CVS Health"). Other subsidiaries of CVS Health

include, among others, CVS Pharmacy, CVS Specialty Pharmacy, and Aetna, Inc., the nation's third-largest health insurer. Caremark transacts business in this District and throughout the United States.

19.     Defendant Express Scripts Inc. is a Delaware corporation with its headquarters in St. Louis, Missouri. Express Scripts is a pharmacy benefit manager and a wholly owned subsidiary of The Cigna Group. Other subsidiaries of the Cigna Group include Cigna Healthcare, the nation's seventh-largest health insurer, and Evernorth Health Services, which operates a mail-order pharmacy, a specialty pharmacy, and a specialty drug distributor. Express Scripts transacts business in this District and throughout the United States.

20.     Defendant MedImpact Healthcare Systems, Inc. is a California corporation with its headquarters in San Diego, California. MedImpact is a pharmacy benefit manager and wholly owned subsidiary of MedImpact Holdings, Inc. Other subsidiaries of MedImpact Holdings include, among others, Birdi, Inc. (a mail order pharmacy) and Specialty by Birdi, a specialty pharmacy. MedImpact transacts business in this District and throughout the United States.

21.     Defendant Navitus Health Solutions, LLC is a Wisconsin corporation with its headquarters in Madison, Wisconsin. Navitus is a pharmacy benefit manager and is owned jointly by SSM Health, a large healthcare system with locations in several states, and Costco Wholesale Corporation, the third largest retailer in the world. Costco has over 550 warehouse pharmacy locations in the United States. Navitus transacts business in this District and throughout the United States.

## IV.     FACTUAL BACKGROUND

### A.  The Early Development of PBMs

22.     PBMs emerged in the late 1950s to address the growing need for managing prescription drug benefits provided by health insurers. With the passage of the Health Insurance Portability and Accountability Act ("HIPAA") in 1996, the role of PBMs expanded. HIPAA was

enacted, in part, "[t]o improve the efficiency and effectiveness of the health care system."[3] In addition to establishing privacy and security standards for PHI and PII, HIPAA included administrative simplification provisions intended to encourage the electronic transmission and processing of health care claims.

23.    After HIPAA became law, myriad small companies emerged that facilitated the electronic transmission and processing of health care claims, acting as intermediaries between healthcare providers and large insurance companies and health plans that lacked the expertise and agility to capitalize on the new law. Over time these small companies began to consolidate and expand, both horizontally by merging with other intermediary companies, and vertically by acquiring companies in other segments of the healthcare industry, including healthcare providers, insurers, and pharmacies, eventually resulting in the highly concentrated market that exists today, which is dominated by a handful of massive, vertically integrated conglomerates, including the PBM Defendants.

24.    Today, PBMs act as central intermediaries in the prescription drug supply chain, bridging the relationships between pharmacies, payers (including health insurers, employers, unions, and government entities), pharmaceutical manufacturers, and drug wholesalers. PBMs contract with health insurers, drug manufacturers, and pharmacies to facilitate the distribution of medications, process claims, and manage reimbursement. They create formularies for their TPP clients, dictating which medications will be offered and in what form (generic or branded), and setting billing rates to the TPPs and reimbursement rates to the pharmacies.

### B.  PBMS' Role in Prescription Drug Transactions

25.    When an individual receives a prescription from a doctor, the first step is to bring or send the prescription to a pharmacy to be filled. If the individual has insurance or is part of an HMO or other health plan, the pharmacy sends the prescription out to the PBM that represents the insurer. The PBM checks to make sure the transaction is covered by the TPP. Once the TPP

---

[3] Office for Civil Rights (OCR), *HIPPA for Professionals*, U.S. Department of Health and Human Services (July 19, 2024), https://www.hhs.gov/hipaa/for-professionals/index.html.

authorizes the transaction, the PBM passes the authorization on to the pharmacy. The pharmacy fills the prescription, then sends an invoice to the PBM, which reimburses the pharmacy at the negotiated rate. The PBM, in turn, sends its own invoice to the TPP. The entire set of transactions is facilitated on an electronic platform provided by the PBM, for which the PBM receives a fee from the pharmacy. The transactions are opaque to the pharmacies and the TPPs: the pharmacies do not know how much the PBM receives from the TPPs, and the TPPs do not know how much the PBM pays the pharmacies. Many PBMs exploit this information asymmetry by charging the TPP a different amount than they reimburse to the pharmacy, and pocketing the difference, known as the "spread."

### C. Vertical Integration and Consolidation of the PBMs

26.     The horizontal and vertical consolidation undertaken by PBMs over the last 30 years has resulted in a highly concentrated market controlled by a few dominant companies. By 2023, the "Big Three" PBMs—Express Scripts, Caremark, and OptumRx—were responsible for processing nearly 80% of the approximately 6.6 billion prescriptions filled annually by pharmacies in the U.S. This growth was and is fueled largely by a frenzy of acquisitions. The following chart illustrates some of the myriad acquisitions that led to the concentration of power in the hands of the largest three PBMs, who control 94% of the market for pharmaceutical transactions:



**Fig. 1** (source: Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, 8 (July 2024), https://www.ftc.gov/reports/pharmacy-benefit-managers-report).

27.    These acquisitions also led to the vertical integration of the PBM Defendants, meaning they either own or are owned by companies that operate upstream and downstream in the supply chain.

28.    As the FTC put it in a recent report on PBMs:

All of the top six PBMs are vertically integrated downstream, operating their own mail order and specialty pharmacies, while one PBM [Caremark] owns and operates the largest chain of retail pharmacies in the nation. Pharmacies affiliated with the three largest PBMs now account for nearly 70 percent of all specialty drug revenue. In addition, five of the top six PBMs are now part of corporate healthcare conglomerates that also own and operate some of the nation's largest health insurance companies, including three of the five largest health insurers in the country. Four of the PBMs are owned by publicly traded parent companies that own affiliates that operate health care clinics. Three have recently expanded into the drug private labeling business, partnering with drug manufacturers to distribute drug products under different trade names. Four healthcare conglomerates now account for an extraordinary 22 percent of all national health expenditures, as compared to 14 percent eight years ago.[4]

29.    As the chart below demonstrates, the two largest PBM Defendants, CVS

---

[4] FTC Report at 2-3 (internal citations omitted).

Caremark and Express Scripts, have coopted smaller entities covering virtually every segment of the healthcare chain, including a healthcare provider, an insurer, a PBM, and mail order and specialty pharmacies service (Caremark also incorporates retail pharmacy stores), among other things.

| Parent/Owner | CVS Health Corporation | The Cigna Group | UnitedHealth Group Inc. | Humana Inc. | MedImpact Holdings Inc. | 19 BlueCross BlueShield plans |
|---|---|---|---|---|---|---|
| Drug Private Labeler | Cordavis Limited | Quallent Pharmaceuticals | NUVAILA | | | |
| Health Care Provider | MinuteClinic, Signify Health | Evernorth Care Group | Optum Health | CenterWell | | |
| Pharmacy Benefit Manager | CVS caremark 34% | EXPRESS SCRIPTS 23% | Optum Rx 22% | Humana Pharmacy Solutions 7% | MedImpact 5% | PRIME THERAPEUTICS 3% |
| "PBM GPO"/Rebate Aggregator | Zinc Health Services | Ascent Health Services | Emisar Pharma Services | Ascent (via contract) | Prescient Holdings Group LLC | Ascent (minority owner) |
| Pharmacy - Retail | CVS Pharmacy | | | | | |
| Pharmacy - Mail Order | CVS Caremark Mail Service Pharmacy | Express Scripts Pharmacy | Optum Rx Mail Service Pharmacy | CenterWell Pharmacy | Birdi, Inc. | Express Scripts Pharmacy (via contract) |
| Pharmacy - Specialty | CVS Specialty Pharmacy | Accredo | Optum Specialty Pharmacy | CenterWell Specialty Pharmacy | Specialty by Birdi | Accredo (via contract) |
| Health Insurer | Aetna | Cigna Healthcare | UnitedHealthcare | Humana | | 19 BlueCross BlueShield plans |

**Fig. 2** (source: *id.* at 6).

30.     Decades of significant market consolidation have endowed the largest PBMs—along with their associated insurance providers and pharmacy chains—with substantial market power over independent pharmacies, non-affiliated insurers, other industry players, and the patients whose healthcare they oversee.

31.     Vertical integration enables the PBM Defendants to increase their profits at the expense of independent pharmacies in a number of ways. Historically, one major revenue stream was "spread pricing," where a PBM billed the insurance company a higher (and sometimes

considerably higher) price for certain drugs than it paid the pharmacy. Due to the lack of transparency in PBM pricing practices, pharmacies were unable to identify when spread pricing occurred.

32.     As public awareness of these exploitative tactics grew, PBMs faced increased scrutiny and criticism. In response, they have shifted to new revenue generating strategies that were only made possible by their vertical integration and dominant market position.

33.     A significant and rapidly growing source of revenue for PBMs is the sale of "specialty drugs," a category encompassing high-cost medications used to treat complex, chronic conditions such as cancer, rheumatoid arthritis, and multiple sclerosis. Some of these medications require specialized handling or administration, such as injections or infusions.

34.     Over the past decade, revenue from specialty drugs has increased at a much faster rate than revenue from traditional pharmaceuticals. From 2016 to 2023, specialty drug revenues more than doubled, rising from $113 billion in 2016 to $237 billion in 2023. Specialty drugs now account for an estimated 40 to 50 percent of total pharmaceutical dispensing revenue nationwide.

35.     The growth of specialty drugs in the market has led to the development of specialty pharmacies, which primarily dispense these high-cost medications, often through mail-order services.

36.     Each of the six largest PBMs operates its own specialty pharmacy, and specialty pharmacies affiliated with the Big Three PBMs collectively account for more than two-thirds of the revenue generated from the sale of specialty drugs.

37.     Given the substantial profit potential, a significant portion of new drugs being developed and sold are classified as specialty drugs. PBMs capitalize on the high costs associated with these medications by compelling or encouraging their plan members to obtain specialty drugs exclusively from the PBMs' affiliated specialty pharmacies. This allows PBMs to charge inflated rates to their own specialty pharmacies while collecting full reimbursement for these costly drugs from health plans.

CLASS ACTION COMPLAINT

38.     The FTC recently concluded that "the Big 3 PBMs reimbursed their affiliated pharmacies at a higher rate than unaffiliated pharmacies" for specialty generic drugs.[5]

39.     The FTC also concluded that the Big 3 PBMs may be steering their most profitable prescriptions away from independent pharmacies and to their own affiliated pharmacies.[6]

### D. Prescription Discount Cards

40.     In recent years, PBMs identified a new avenue to leverage their market dominance for additional revenue while simultaneously restricting competition: discount card programs.

41.     Historically, prescription discount cards offered an option for patients without insurance coverage or whose insurance did not cover a particular medication to obtain more affordable prescriptions.

42.     PBMs established discount programs by negotiating direct or cash network pricing (i.e., prices not subject to insurance reimbursement rates) with pharmacies and partnering with marketing firms to promote and distribute the discount cards to consumers.

43.     Pharmacies often agreed to accept certain discount cards so as to foster customer loyalty and attract foot traffic, as patients frequently purchase other items in addition to their prescriptions, even though the pharmacies typically incurred losses on the prescription transactions.

44.     Prescription discount cards differ from manufacturer coupons, although the consumer experience may appear similar. Drug manufacturers sometimes offer coupons for new brand-name medications to reduce patients' out-of-pocket expenses. Under these programs, the patient's insurance is billed as usual, the co-payment is reduced, and the manufacturer later

---

[5] Fed. Trade Comm'n, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers*, Interim Staff Report, 2 (January 2025) https://www.ftc.gov/reports/specialty-generic-drugs-growing-profit-center-vertically-integrated-pharmacy-benefit-managers (internal citations omitted).
[6] *Id.*

CLASS ACTION COMPLAINT

reimburses the pharmacy for the remaining balance. These coupons are typically limited to brand-name medications, offered for a finite period, and subject to usage restrictions.

45.    In contrast, pharmacies do not receive reimbursement from a third-party payer for transactions involving discount cards and instead remit a portion of the payment received from the patient to the PBM in the form of a fee.

46.    Traditionally, pharmacies contracted with PBMs to accept discount cards based on the assumptions that: (i) the cards could serve as a marketing tool to attract new customers, and (ii) their use would be limited primarily to instances where the patient's prescription was not covered by an insurance plan, Medicare, or Medicaid.

47.    Following the market consolidation and concomitant power therein of the major PBMs, and their recognition of discount card transactions as a lucrative revenue stream, PBMs began requiring pharmacies to accept all their discount cards as a condition of participating in their networks. To remain in-network, pharmacies are generally obligated to accept the full range of a PBM's discount cards, even when such transactions result in financial losses for a considerable number of prescriptions.

### E.  How GoodRx Works

48.    GoodRx was launched in 2011 as a platform for aggregating prescription discount cards. The company analyzes the various discount card prices offered by major PBMs to identify the lowest price available to the patient. If this price is lower than the patient's out-of-pocket cost under the patient's insurance plan, the patient has the option to use the discount card instead.

49.    In such cases, the patient's insurance is not billed, and the cost is not applied toward any deductible or out-of-pocket maximum. Although GoodRx promotes its offerings as "prescription drug coupons," the service it actually provides is access to PBM-administered discount card programs rather than manufacturer-provided drug coupons.

50.    GoodRx's primary business model involves collecting and analyzing PBM pricing data on prescription medications, with a proprietary "pricing engine." GoodRx's "price

ingestion technology enables [GoodRx] to link with multiple sources spanning the healthcare industry."[7]

51.     Consumers can use GoodRx as a tool to pay less for their prescriptions, but until recently, they needed to check GoodRx prices before filling their prescription and present the GoodRx card at the pharmacy. If a consumer chose to use his or her GoodRx card, the pharmacy would submit the claim to the PBM offering the lowest out-of-pocket cost to the patient (and lowest reimbursement rate to the pharmacy), rather than the patient's primary PBM, which may or may not be affiliated with the patient's health insurance provider.

52.     For each discount card transaction, the PBM collected a fee from the pharmacy. When a patient used GoodRx to identify a discount card, the PBM shared a portion of that fee with GoodRx. According to company reports, GoodRx earns approximately 15 percent of the total retail cost of a prescription on each transaction.

53.     In this type of transaction, there is no health plan or third-party payer reimbursing the pharmacy, as occurs in a typical insurance transaction. Instead, the patient directly pays the retail price, which serves as the revenue source for the pharmacy, GoodRx, and the PBM.

54.     GoodRx, which went public in 2020, has experienced and continues to experience rapid growth as more consumers discover that discount card prices can often be lower than their insurance co-pays.

## V.     DEFENDANTS' ANTICOMPETITIVE CONDUCT

55.     As GoodRx's revenue and presence in the prescription market have grown, the company has sought to expand beyond its basic business model. GoodRx's 2023 Annual Report outlines its ongoing growth strategy of "pursu[ing] strategic partnerships and acquisitions," including agreements with PBMs and pharmacies to coordinate prices.

> We are a valuable partner to a variety of healthcare constituents. We have entered into a number of strategic agreements in recent years. For example, in 2022, we began to enter into direct contractual agreements with select

---

[7] GoodRx Holdings, Inc., *2022 Annual Report*, 12, https://investors.goodrx.com/static-files/1ebae550-3e31-465c-8e6a-f5c943f4e7bd (last visited Jan. 13, 2025).

pharmacies to complement the existing contractual agreements with our PBM partners. In addition, starting in 2023, through our partnerships with Express Scripts and CVS Caremark, we commenced operation of our integrated savings programs, which integrates our competitive discounts and pricing in a seamless experience at the pharmacy counter for eligible plan members they serve. Eligible plan members only need to utilize their existing benefit card at their preferred in-network pharmacy to benefit from our discounts and pricing, with no further action required. As part of our business strategy, we will continue to pursue strategic opportunities, including commercial relationships and acquisitions, to strengthen our market position and enhance our capabilities.[8]

56.    The "integrated savings programs" outlined in GoodRx's Annual Report represent a significant shift in the use of discount cards and their role in the prescription drug market. As detailed further below, these partnerships between GoodRx and PBMs constitute an overarching price-fixing conspiracy that is intended to and does: (a) reduce competition among PBMs; (b) lower reimbursements to independent pharmacies; and (c) increase fees paid by independent pharmacies to GoodRx and the PBM Defendants.

57.    If permitted to continue, these partnerships will accelerate the closure of independent pharmacies, which serve as a crucial check on the market power of large PBM-affiliated pharmacy chains.[9] In short, Defendants' partnerships will further erode competition in the U.S. pharmacy market, as it was designed to do.

### F.  Defendants' Price-Fixing Conspiracy

58.    Beginning in 2022, GoodRx began implementing the ISP Scheme, announcing new partnerships with each of the four PBM Defendants, collectively covering over 60% of eligible U.S. patients. These partnerships provide "automatic access" to "GoodRx's pricing" for generic medications, which reflects the prices offered by PBMs under their discount card

---

[8] GoodRx Holdings, Inc., *2023 Annual Report*, 12, https://investors.goodrx.com/static-files/108587f6-12e7-4b9c-98dd-77b57f023b38#:~:text=Over%20the%20history%20of%20the,GoodRx%20plays%20is%20prett y%20simple (last visited Jan. 13, 2025).

[9] Independent Pharmacies also provide highly-valued services the chain pharmacies do not provide, such as detailed medication counseling, comprehensive medication reviews, custom compounding of medications, specialized delivery options, and a deeper focus on community health needs.

programs. According to the announcements, the price paid by the patient is applied to the patient's deductible or out-of-pocket maximum.

59.     The first such "partnership" was between GoodRx and Express Scripts and announced during GoodRx's Q3 2022 earnings call on November 8, 2022. During the call, GoodRx co-founder Trevor Bezdek announced that starting in early 2023, Express Scripts members would have seamless access to GoodRx prices for eligible generic medications.

60.     In 2023, GoodRx announced three additional "partnerships."

61.     On July 12, 2023, GoodRx and Caremark introduced a program called "Caremark Cost Saver." Under the program, Caremark members "have automatic access to GoodRx's prescription pricing . . . on generic medications." Caremark "members only need to utilize their existing benefit card at their preferred in-network pharmacy. No action is required by the plan member." The program was launched on January 1, 2024.

62.     On September 13, 2023, GoodRx and MedImpact launched a program where, "when an eligible MedImpact member fills a prescription for a generic medication, [GoodRx] will automatically compare their benefit and the GoodRx price." The program began on January 1, 2024.

63.     On October 12, 2023, GoodRx and Navitus announced a similar program where GoodRx "provides members with automatic access to GoodRx prices . . . at the pharmacy counter." The program became immediately available to some members, with broader access provided in January 2024.

64.     While these so-called "partnerships" were announced separately, they were in fact entered into by each PBM Defendant with the knowledge that the other competing PBM Defendants were entering into the same partnerships and that all such partnerships would function identically.

65.     These partnerships introduced a new process for reimbursing pharmacies for filling prescriptions. When a prescription claim is received, rather than reimbursing the

pharmacy and forwarding the claim to the patient's insurance provider, the insurer's PBM uses GoodRx's software to analyze other PBMs' discount programs and determine if any offer a price lower than the patient's insurance out-of-pocket cost.

66.     If GoodRx identifies a PBM with a lower patient cost (and reimbursement to the pharmacy), the patient's PBM redirects the transaction to the PBM offering the lower price, applies the discounted price to the transaction and the patient's deductible, and charges the pharmacy a fee. That fee is divided among the patient's PBM, the PBM processing the transaction, and GoodRx.

67.     By systematically reducing the reimbursement to independent pharmacies, the ISP scheme ultimately hurts consumers in the long run by reducing competition in the Relevant Market.

68.     This scheme, conducted entirely without the patient's knowledge, operates as follows: (i) a pharmacy fills a generic prescription and submits a claim to one of the PBM Defendants; (ii) the PBM analyzes GoodRx's data to identify whether any other PBM offers a discount card price lower than the patient's insurance out-of-pocket cost; (iii) if such a lower discount card price is found, the patient's insurer's PBM redirects the claim through GoodRx to the PBM offering the lower price; (iv) the patient's insurer's PBM applies the discount card price to the patient's insurance deductible; (v) the patient pays the discounted price at the pharmacy counter; (vi) the pharmacy pays a fee to the discount card PBM; (vii) the discount card PBM shares part of this fee with GoodRx; and (viii) GoodRx remits a portion of the fee to the patient's insurer's PBM.

69.     These partnerships were intended to, and do, operate as a price-fixing arrangement, by providing the PBM Defendants access to competitive pricing from other PBMs, and harming independent pharmacies like Plaintiffs and the members of the Class with the lowest possible reimbursement rate for each transaction.

70.     The partnerships significantly increase the percentage of prescriptions processed

through discount cards rather than traditional insurance transactions. By focusing on generic drugs, Defendants are undermining a critical revenue stream that independent pharmacies rely on for their survival.

71.    As explained above (*see supra* Section IV.C.), in discount card transactions, the PBMs claim a portion of the patient's payment at the point of sale through fees collected from the pharmacies, making these transactions more profitable for PBMs than regular insurance claims.

72.    By sharing discount card pricing data and automatically directing prescriptions to the PBM offering the lowest reimbursement rate for pharmacies, PBMs maximize the number of prescription drug transactions routed through discount cards, which generate higher profits for them. This strategy comes at the expense of regular insurance transactions, which are essential to the financial health of independent pharmacies.

### G.  Harm to Competition

73.    Independent pharmacies not affiliated with the major PBMs have suffered harm as a result of Defendants' price-fixing arrangement.

74.    As noted in the FTC's July 2024 report, PBMs—including those without affiliated retail pharmacies—perceive independent retail pharmacies not as clients for their services but as competitors and a threat to their market dominance:

75.    In addition to increasing their market power from consolidation, leading PBMs have vertically integrated not only with their own retail pharmacies, but also with specialty and mail order pharmacies. This vertical integration may be increasing PBMs' ability and incentive to disadvantage rival, independent pharmacies that directly compete with the PBMs' affiliated pharmacies. One internal PBM document—from a PBM that does not operate a retail pharmacy—makes clear that smaller, unaffiliated pharmacies are viewed as competitors with even the PBMs' non-retail affiliated pharmacies: "Retailers are our competitors. There is no win-

win solution. We are seeking the same Rx. We need the best rates.[10]

76.     PBM Defendants have the incentive to disadvantage independent pharmacies within their networks since independent pharmacies compete with PBM Defendants' retail and mail order pharmacies.

77.     Independent pharmacies generally lack the resources to monitor the intricate financial arrangements that determine their reimbursement rates from PBMs for all prescription transactions.

78.     Independent pharmacies are harmed by the diverse revenue streams (e.g., income from specialty drugs and fees associated with discount card transactions) generated through the vertical integration and market dominance of PBMs and their affiliated pharmacies.

79.     This creates an uneven playing field, enabling PBM-affiliated pharmacies to offset losses on traditional prescription services with monopoly-driven profits. Independent pharmacies, lacking such advantages, are unlawfully disadvantaged. A growing number of independent pharmacies have been forced to close their doors as a direct result of PBMs' anticompetitive practices, further consolidating PBMs' market power.

80.     The ISP Scheme has exacerbated the financial challenges faced by independent pharmacies. Decreased reimbursement rates and increased fees imposed by PBMs have effectively diverted prescription drug dispensing revenue away from independent pharmacies to the Defendants and non-Defendant PBMs.

81.     This decline in revenue has contributed—and will continue to contribute—to the financial collapse of independent pharmacies, forcing closures and reducing competition.

82.     In 2023, independent pharmacies closed at an alarming rate of approximately one per day. A March 2024 survey conducted by the National Community Pharmacists Association among 10,000 Independent Pharmacy owners and managers revealed that one-third were

---

[10] Fed. Trade Comm'n, *supra* note 1, at 54.

considering shutting down in 2024 due to financial pressures.[11] This trend is expected to accelerate as discount card transactions further erode profitability.

83.    The closure of independent pharmacies negatively impacts the quality of care that patients receive. Independent pharmacies have historically been a source of innovation, often adopting new technologies and services to enhance patient care.

84.    In contrast, large chain pharmacies, due to their size and bureaucratic complexity, face significant obstacles in implementing such innovations across their extensive networks. Independent pharmacies, with fewer locations, can more quickly and efficiently integrate new technologies and practices.

85.    Independent pharmacies are often deeply embedded in their communities, providing personalized care and support tailored to patients with specialized needs, chronic conditions, or complex medication regimens.

86.    In rural and underserved areas—markets that large chains often avoid due to lower profitability—independent community pharmacies frequently serve as the cornerstone of healthcare access. For many rural patients, independent pharmacies are the sole option for obtaining prescriptions. By offering flexible, individualized, and nontraditional care, independent pharmacies have historically competed effectively with larger chains. However, Defendants' anticompetitive conduct threatens to eliminate this vital avenue of competition.

## VI.    RELEVANT MARKET AND MARKET POWER

87.    The relevant market in this case is the market for pharmacy reimbursements for prescription drug dispensing services provided by network pharmacies in the U.S. (the "Relevant Market"). These services are supplied by pharmacies and purchased by PBM Defendants on behalf of third-party payers, such as health insurers.

---

[11] *See* Maia Anderson, *Nearly A Third of Independent Pharmacies at Risk of Closure In 2024*, Healthcare Brew (March 25, 2024), https://www.healthcare-brew.com/stories/2024/03/25/nearly-a-third-of-independent-pharmacies-at-risk-of-closure-in-2024.

CLASS ACTION COMPLAINT

88. The Big 3 PBMs, two of which are PBM Defendants, process nearly 80% of prescription drug claims in the United States, an increase from 70% in 2016. When Humana, Prime Therapeutics, and Defendant MedImpact are included, the group controls more than 90% of all claims.

89. Specifically, the PBM Defendants control reimbursement for over 60 percent of eligible U.S. prescription transactions. As a result, pharmacies have no viable option but to contract with the PBM Defendants.

90. Each PBM Defendant operates as a wholly owned subsidiary of a healthcare conglomerate that also owns mail-order, specialty, and retail pharmacies, as well as large health insurance companies and other entities involved in the prescription dispensing market. *See supra* Figure 2.

91. The relevant geographic market in this case is the U.S. The U.S. healthcare industry, including the Relevant Market, is governed by federal and state laws and regulations that are unique to the U.S. The relevant geographic market cannot be smaller than the U.S., as pharmacy reimbursements are determined by PBMs operating nationwide.

92. Defendants, both collectively and individually, wield sufficient market power to harm competition in the Relevant Market.

## VII.    ANTITRUST INJURY

93. Defendants' anticompetitive conduct caused and causes independent pharmacies to suffer antitrust injury in the form of:

(a)    Decreased reimbursements for dispensing generic prescription drugs; and

(b)    Increased fees to Defendants resulting from discount card transactions.

94. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.    INTERSTATE COMMERCE

95. At all relevant times, Defendants offered, adjudicated, and disbursed

reimbursements for prescription drug claims in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

96.    At all relevant times, Defendants transmitted and received funds, contracts, invoices, and other forms of business communications and transactions, through the mail and over the wires in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States in connection with the adjudication of prescription drug reimbursements as part of GoodRx's Integrated Savings Program.

97.    In furtherance of their efforts to restrain competition, Defendants employed the U.S. mail and interstate and international telephone lines, as well as means of interstate and international travel. Defendants' activities were within the follow of and have substantially affected (and will continue to substantially affect), interstate commerce.

## IX.    CLASS ACTION ALLEGATIONS

98.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as a representative of the following Class:

> All entities in the United States and its territories that have (1) dispensed a generic prescription drug to an insured patient and (2) received reimbursement from one of the PBM Defendants for that drug at a GoodRx-supplied price from January 1, 2023 (or the date on which Express Scripts launched its Price Assure program) until the anticompetitive effects of Defendants' unlawful conduct cease.

99.    The following persons and entities are excluded from Class:

(a)    All pharmacies owned by, operated by, or affiliated with the PBM Defendants;

(b)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(c)    All federal governmental entities;

(d)    All Counsel of Record; and

(e)    The Court, Court personnel, and any member of their immediate families.

100.    The Class is so numerous and geographically dispersed as to make joinder

impracticable. Plaintiffs do not know the exact number of Class members but can obtain it from Defendants in discovery. Plaintiffs believe that there are at least thousands of Class members.

101.   Common questions of law or fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful schemes, Defendants' anticompetitive conduct impacted all or nearly all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact or law include:

(a)   Whether Defendants formed a horizontal contract, combination, or conspiracy, pursuant to which they artificially suppressed the rate paid to independent pharmacies for dispensing medications to individuals who prescription drug benefits were administered by the PBM Defendants;

(b)   Whether Defendants' alleged misconduct constitutes a violation of Section 1 of the Sherman Antitrust Act;

(c)   Whether Defendants' conduct caused members of the Class members to receive artificially-suppressed reimbursements for dispensing medications to patients whose prescription drug benefits were administered by the PBM Defendants;

(d)   Whether the anticompetitive scheme alleged herein has substantially affected interstate commerce;

(e)   Whether Defendants' anticompetitive conduct caused antitrust injury to Plaintiffs and members of the Class;

(f)   Whether a monetary damages methodology exists that is capable of providing damages on a classwide basis, and the proper quantum of such damages; and

(g)   Whether injunctive relief is warranted to end Defendants' anticompetitive conduct.

102.   These common questions predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to and injuring the Class as a whole. In cases alleging a horizontal price-fixing conspiracy, the common

questions regarding the conspiracy's alleged existence by itself has been held to predominate over any conceivable individualized issues, thus warranting class certification.

103.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will enable thousands of independent pharmacies to benefit from the prosecution of one action in a single forum efficiently and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in managing this class action.

104.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 2.

## X.    CLAIMS FOR RELIEF

### COUNT I
### Price Fixing in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

105.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

106.    Plaintiffs seek relief on behalf of themselves and all Class members under Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15) for Defendants' conduct in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

107.    Acting directly and through their respective divisions, subsidiaries, agents, and affiliates, Defendants participate in interstate commerce related to the reimbursement of claims for prescription drugs.

108.    The PBM Defendants are horizontal competitors in the Relevant Market. Those The PBM Defendants compete to secure contracts with health plans, which authorize them to reimburse claims for prescription drugs used by the health plans' members and to generate revenue from pharmacies as part of these reimbursements. GoodRx and the PBM Defendants also compete directly with each other for patients' claims involving prescription drug

reimbursements.

109.    Starting on or around January 1, 2023, Defendants entered into and engaged in an ongoing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce.

110.    Specifically, Defendants conspired to artificially lower prescription drug reimbursement rates to Plaintiffs and the Class.

111.    In furtherance of that conspiracy, Defendants have committed various acts, including the following:

(a)    The PBM Defendants shared confidential, proprietary, and detailed internal reimbursement data with GoodRx to compare their negotiated rates against those aggregated by GoodRx, a *per se* violation of Section 1 of the Sherman Act;

(b)    The PBM Defendants integrated GoodRx's reimbursement aggregator into the PBM Defendants' claims processing systems, granting the PBM Defendants real-time access to competitors' negotiated rates and enabling them to identify competitors;

(c)    The PBM Defendants utilized data from GoodRx's integrated aggregator to determine reimbursement rates for prescription drug claims, a *per se* violation of Section 1 of the Sherman Act;

(d)    The PBM Defendants paid reimbursements for prescription drug claims based on rates provided by GoodRx's integrated aggregator;

(e)    The PBM Defendants delegated control of reimbursement rates to GoodRx, fully aware that GoodRx would establish artificially low rates;

(f)    The PBM Defendants exchanged sensitive, real-time, confidential, and detailed prescription drug claim reimbursement data with each other through GoodRx's integrated aggregator;

(g)    The PBM Defendants increased fees imposed on independent pharmacies by

allowing both GoodRx and a patient's PBM to collect fees, whereas only one party would have done so absent the ISP Scheme; and

(h)    The PBM Defendants evaded effective rate guarantee obligations to independent pharmacies by transferring transactions that would otherwise be covered under those guarantees to GoodRx, which is excluded from such guarantees.

112.    The conduct alleged herein is *per se* unlawful. and is also unlawful under a quick look or rule of reason analysis.

113.    As a direct and proximate result of Defendants' unlawful cartel, Plaintiffs and Class members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

114.    Plaintiffs and the Class are entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court:

(a)    Determine that this action may be maintained as a class action, appoint Plaintiffs as the class representatives and their counsel as class counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

(b)    Adjudge and decree that Defendants have entered into a contract, combination, or conspiracy to fix, raise, stabilize, or maintain reimbursements for prescription drugs at artificially low levels in violation of Section 1 of the Sherman Act;

(c)    Enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action,

including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law;

(d)    Enjoin Defendants from continuing to engage in anticompetitive practices alleged herein and from engaging in other practices with the same purpose and effect as the challenged practices; and

(e)    Award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XI.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

CLASS ACTION COMPLAINT

Dated: March 6, 2025                     Respectfully submitted,

                                         /s/ *Kevin Rayhill*
                                         Kevin Rayhill

                                         **JOSEPH SAVERI LAW FIRM, LLP**
                                         Joseph R. Saveri (*pro hac vice* forthcoming)
                                         Cadio Zirpoli (*pro hac vice* forthcoming)
                                         Christopher K.L. Young (*pro hac vice* forthcoming)
                                         Kevin E. Rayhill*
                                         601 California Street, Suite 1505
                                         San Francisco, CA 94108
                                         Tel (415) 500-6800
                                         Facsimile: (415) 395-9940
                                         jsaveri@saverilawfirm.com
                                         czirpoli@saverilawfirm.com
                                         cyoung@saverilawfirm.com
                                         krayhill@saverilawfirm.com

                                         *Admitted to the U.S. District Court for the Western
                                         District of Wisconsin*

                                         **Gratz & Gratz, P.A.**
                                         Michael Gratz, Jr.
                                         312 North Green Street
                                         Tupelo, MS 38804
                                         Telephone: 662.844.5531
                                         Fax: 662.844.8747
                                         michael@gratzandgratz.com

                                         **COTCHETT, PITRE & McCARTHY LLP**
                                         Joseph W. Cotchett
                                         Adam J. Zapala
                                         Elizabeth T. Castillo
                                         Christian S. Ruano
                                         840 Malcolm Road
                                         Burlingame, CA 94010
                                         Telephone: (650) 697-6000
                                         Facsimile: (650) 697-0577
                                         jcotchett@cpmlegal.com
                                         azapala@cpmlegal.com
                                         ecastillo@cpmlegal.com
                                         cruano@cpmlegal.com

                                         *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT